IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2024 Session

**STATE OF TENNESSEE v. BRENTNOL CALVIN JAMES**

**Appeal from the Criminal Court for Davidson County**
**No. 2021-A-365     Steve R. Dozier, Judge**
_____

**No. M2024-00193-CCA-R3-CD**
_____

A Davidson County jury convicted the Defendant, Brentnol Calvin James, of first degree premeditated murder, and the trial court imposed a life sentence. On appeal, the Defendant asserts that the evidence of premeditation was insufficient to support his conviction, and that the trial court erred by failing to provide a jury instruction on self-defense. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Patrick T. McNally (on appeal), Jim Todd and Katherine Hagan (at trial), Nashville, Tennessee, for the appellant, Brentnol Calvin James.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeffrey A. George and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's shooting the victim, Brian Shannon, Jr., on November 14, 2020. A Davidson County grand jury indicted the Defendant for first degree premeditated murder. At a trial on the charge, the parties presented the following evidence.

On November 14, 2020, Valeria Buck, a Nashville Fire Department paramedic, responded to a shooting call on Trinity Lane. When she arrived, she saw the victim lying on the sidewalk in a pool of blood. The blood had begun to congeal, and she observed brain matter on the ground. Because the victim was still breathing on his own and his pulse

was rapid, Ms. Buck and her driver moved him "pretty quickly" for transport to the hospital. As they moved him to the spine board, it appeared there was "some deformity" to the upper back portion of the victim's head, but due to the volume of blood, she was unable to ascertain the exact location of the injury. She quickly inspected the victim's torso and found no indication of gunshot wounds to that area.

Monique Shannon, the victim's wife, testified that her husband brought breakfast home on the morning of November 14, 2020. As he deposited the food, he stated he wanted to know why the Defendant, who owned a nearby auto body shop, had photographed the Shannons' residence. The victim had previously told his wife that the Defendant suspected that their son had attempted to rob him. The victim left the house to walk over to the auto body shop and ask the Defendant about the photography. The body shop was approximately one tenth of a mile from the Shannon house. Shortly thereafter, Ms. Shannon decided to go to the store to buy a drink. As she was leaving her residence, she saw the victim lying on the ground. She drove toward the area where she saw him, parked her car, and looked directly at the Defendant saying, "you killed my husband." The Defendant responded angrily by yelling at Ms. Shannon and pointing at her. Fearful for her safety, Ms. Shannon moved to the side of the car to protect herself from any gunfire. Once the police officers arrived, they instructed her to remain behind the car while they arrested the Defendant.

Francis Diaz was working in her store on the day of the shooting when she heard gunfire. Ms. Diaz went outside to see if anyone was hurt. The Defendant's auto body shop was approximately 100 feet from her shop. She saw the Defendant, who was "very upset," holding a gun. She heard the Defendant loudly say, "nobody is going to come to my property and yell at me."

Olivia Workman and her friend "Cassie" were driving to a coffee shop when she observed a man beating another man on the side of the road. Cassie pulled the car over, and Ms. Workman called 911. The man who had been punching the other man walked away leaving the body lying on the side of the road. A woman drove up and began crying and screaming. Ms. Workman and Cassie remained in the car, as the 911 operator instructed, until the police arrived. Ms. Workman did not hear any gunfire and was unaware of a shooting at the time of these events.

Metro Nashville Police Officer Brandon Evans responded at 9:21 a.m. on November 14, 2020, to East Trinity Lane to a report of a shooting. As Officer Evans and Officer Baker approached the address , Officer Evans heard Officer Baker shout "drop the gun." While the Defendant lay on the ground, Officer Evans handcuffed the Defendant. A crowd was gathering at this point, and Officer Evans lifted the Defendant to his feet, picked up a pistol lying on a vehicle next to where the Defendant had laid down, and escorted the

Defendant to Officer Evans's patrol car. Once at the patrol car, Officer Evans searched the Defendant and found a magazine for the pistol in his right pocket. Officer Evans identified in court the pistol, a Ruger 9-millimeter, the eleven rounds of ammunition found in the pistol, and the ten rounds of ammunition found in the magazine. He confirmed that the pistol had a seventeen-round capacity, and the magazine had a ten-round capacity.

Metro Nashville Police Officer Maria Reynolds was in training on November 14, 2020, and rode along with Officer Josh Baker. Officer Baker and Officer Reynolds arrived at the shooting scene first, followed by Officer Evans. Officer Baker and Officer Evans advanced toward the Defendant in "an L-shaped pattern to kind of corner" him. Officer Reynolds rendered aid to the victim. Officer Reynolds quickly observed that the victim was bleeding from his head but she found no other injuries. The victim was lying on the ground in front of the auto body shop with his feet toward the road and his head toward the shop.

Metro Nashville Police Officer Josh Baker observed a man lying on the sidewalk. A man at the scene motioned to an area, indicating the shooter's location. Officer Baker held his gun on the Defendant until Officer Evans was able to handcuff him. Officer Evans escorted the Defendant to his patrol car, and Officer Baker turned his attention to the victim. The victim had a large wound to the back of his head and irregular breathing. Officer Baker turned the victim to his side to prevent him from choking on his blood and waited for the paramedics. The victim was not armed.

Metro Nashville Police Detective[1] Kyle Williams arrived at the scene and spoke to the responding officers, Officer Baker and Officer Evans. He obtained surveillance video footage from a business located across the street. The State introduced the surveillance video. It showed the victim walking across the street and approaching the auto body shop. He did not enter the auto body shop but stood in the driveway and pointed toward his house. As he turned and started to walk away, the Defendant followed him and grabbed him from behind. The victim tried to resist but ultimately fell to the ground. The Defendant turned and walked back into his business while the victim remained on the ground.

Detective Williams interviewed the Defendant at Metro Nashville Police Headquarters. The State played a recording of the interview for the jury. During the interview, the Defendant admitted to shooting the victim. The Defendant referenced an ongoing dispute between the parties. He explained that earlier that morning he had gone to the victim's house and photographed the house with the intent to post the picture on Facebook to warn others that the victim's son had shot him. The Defendant drove away

---

[1] At the time of trial, Kyle Williams worked as a special agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives.

when he saw the victim. The victim walked to the Defendant's business and asked the Defendant why he was taking pictures and threatened to kill the Defendant. The Defendant confirmed that the victim did not enter his business but remained outside and that the Defendant walked outside to the victim. The Defendant stated that when the victim threatened him, he "went and g[o]t [his] gun and [he] started swinging." About his shooting the victim, the Defendant stated, "He need to die," and that he had fired the gun multiple times. The Defendant admitted ownership of the gun used during the shooting, and he confirmed that he placed the gun on a car near him after shooting the victim. The Defendant stated that the victim threatened him by shoving his hand in his pocket when the victim saw the Defendant at "the store."

The Defendant explained that the victim's son shot the Defendant in the knee in 2015. Detective Williams asked the Defendant, "if [the victim] is dead what would you say to that?" The Defendant responded, "Glad. Should [be] dead ten time over. Because he never, he never get no right for coming out, what they done to me, he should [be] dead, his mother should [be] dead, his wife should [be] dead, all the family should [be] dead. They are dogs." The Defendant stated that he could not recognize the victim or his wife, but he could recognize the victim's son and "little daughter" because they came "regularly, pass regularly and do weird [stuff] to me." Detective Williams confirmed that the Defendant never claimed that the gun accidentally discharged.

Detective Williams investigated the Defendant's allegations about an incident in 2015. He learned that the Defendant was the victim of a robbery on October 3, 2015, and that Bree Starnes was arrested for the offense. He found no indication that the victim was involved in the incident or "ever did anything to [the victim]." Detective Williams stated that he did not observe any no trespassing signs at the Defendant's auto body shop.

Caleb Foster, an MNPD Crime Scene Investigator, arrived at the Trinity Lane crime scene and observed two cartridge cases, a stack of clothing, and possible blood stains on the driveway entrance to the business. Officer Foster's primary responsibility that day was to photograph the scene. He took approximately ninety photographs, several of which were offered into evidence.

Davidson County Chief Medical Examiner Dr. Feng Li testified as an expert witness in the field of pathology. Dr. Li performed an autopsy on the victim's body. Dr. Li found three gunshot wounds. The first gunshot wound went through the brain and had partially exited the body. Dr. Li opined that the gun was fired from intermediate range meaning between two and half to three feet. The second wound was a perforating wound. The bullet went through the victim's ear lobe, and the gun was fired from more than three feet away. The third gunshot wound was caused by a continuation of the bullet from the second gunshot wound. This bullet went through the earlobe and embedded on the right side of

the neck. The bullet moved in a downward location and was lodged inside the chest cavity. Dr. Li also observed blunt force injuries to the victim's head. Dr. Li documented his findings in his medical report concluding that the cause of death was multiple gunshot wounds and the manner of death was homicide. The toxicology report revealed the presence of cocaine metabolite and marijuana metabolite in the victim's system.

The State concluded its case-in-chief, and the defense offered one witness, the Defendant. The Defendant testified that he moved from Guyana, South America to the United States in 1988, seeking an education and "a better life." In 2010, the Defendant opened an auto body shop on Trinity Lane.

The Defendant testified about an incident that occurred in October 2015. One evening he observed two individuals pacing in front of his shop. He later learned that one of the two people was the victim's son. He observed the two people pointing at his surveillance cameras and surveillance cameras of a neighboring business. The Defendant passed his business and walked to a nearby store. As he passed, he heard the people stating, "these foreigners think they can come over here and build what they want and do what they want."

The following day, the Defendant left his shop after work and went home. A customer, Bree Starnes, came to the Defendant's house. She told the Defendant she was looking for her child's father's residence. Ms. Starnes wanted the Defendant to show her where her child's father had moved. Ms. Starnes held the front door open as the Defendant dressed to go with Ms. Starnes. As they prepared to leave, a man walked up and put a gun to the Defendant's head and asked for the Defendant's wallet. Another man came from the side of the house and put another gun to the Defendant's head. The Defendant recognized one of the men from the night before outside his auto body shop. He later learned this man was the victim's son. The second man who approached pulled the trigger on his gun, but it did not fire. The victim's son then shot the Defendant in the foot. The men told him not to call the police or they would return and then the two men fled. The Defendant called the police, and the police searched his house. The police recovered marijuana from the house, but the Defendant was not charged with possession. Ms. Starnes was later arrested and charged.

The Defendant testified that he told the victim that his son had shot the Defendant and that the victim responded that he was going to tell his son to "finish [him] off." In 2018 or 2019, the victim would "peel his tire[s]" in front of the Defendant's shop. In July 2020, the Defendant filed a civil lawsuit against the victim's son for the 2015 shooting. He explained that he did so to stop the victim and his son - "to get some distance between him and the Shannons." The Defendant requested the Davidson County's Sheriff's Department serve the victim's son notice of the suit. He was later notified that the Sheriff's Department

was unable to serve the warrant. It was because of this notice that the Defendant tried to photograph the victim's home in November 2020. He believed the photograph would assist Sheriff's deputies in serving the victim's son. Due to some glitch with his phone, however, he was unable to take the picture, but he did see the victim in the yard before he drove away.

The Defendant returned to his shop where he maintained that there were no trespassing signs clearly posted. He explained that he posted the signs for insurance purposes related to customer safety inside the garage bay area. He was inside the garage when he heard someone call his name, initially thinking it was a customer. He walked to the door and saw the victim. The victim was cursing and threatening the Defendant. The Defendant described the victim as "in a rage" and that the victim charged toward him. This caused the Defendant to be fearful, and he believed he needed to defend his property based upon his 2015 interaction with the victim's son. The Defendant walked outside so that "they could see me in the clear and he would stop." The victim moved toward the Defendant and began circling him. The victim raised his hand several times to strike the Defendant, but the Defendant moved away. The Defendant withdrew his gun and squeezed the trigger in an attempt to scare the victim away, but the gun did not fire. The Defendant then began hitting the victim with his gun in order to protect himself. He did not recall if he was pulling the trigger at this point, but he was squeezing the gun tightly. The Defendant heard the gun discharge, and the victim went down on his knees. When the victim fell down, the Defendant turned to leave and the victim "jumped up and try to grab [the Defendant]." The Defendant swung and hit the victim. The victim was motionless this time, so the Defendant returned to his shop. The Defendant set his gun down and waited for the police to arrive.

The Defendant agreed that there were statements that he made during his police interview that he regretted. The Defendant stated that he was deeply sorry for the shooting and that he had no intention to harm the victim.

On cross-examination, the Defendant denied that the victim ever walked away from him. He explained that the two men ended up at the end of the driveway by the street while they were fighting and not because the victim turned and walked away. The State played the surveillance video footage of the shooting. When confronted with the portion showing the Defendant running toward the victim who is walking away from the shop, the Defendant conceded that in the surveillance video recording it appeared he was running toward the victim but to the Defendant, at the time, it felt like the victim was trying to go around the Defendant. The Defendant agreed that the victim was not present during the 2015 robbery, but he asserted that the victim had sent his son to rob the Defendant.

The Defendant maintained that he was attempting to photograph the victim's house to assist the Sheriff's deputies in serving the victim's son with the civil warrant, which contradicted his statement during the police interview that he planned to post the pictures on Facebook. The Defendant stated that he told the detective during his police interview that the gun misfired and that he had only swung the gun at the victim, which contradicted his statements in the video recording of the interview. The Defendant explained the discrepancies between what he claimed he said during the police interview and the written report by saying that the police wrote what they wanted to write.

On redirect, the Defendant explained that he followed the victim away from his shop because the victim was still making threats. The Defendant feared the victim was moving to "get a better angle on me to shoot me."

After hearing the evidence, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a life sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is not sufficient to prove premeditation and that the trial court erred by failing to provide the complete pattern jury instruction for self-defense.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for first degree premeditated murder. He specifically attacks the element of premeditation, asserting that the State failed to prove that he was free from excitement or passion. The State responds that a reasonable jury could conclude that the Defendant's shot the victim with premeditation. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.

*Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise

of reflection and judgment." T.C.A. § 39-13-202(d) (2018). "The mental state of the accused must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id*. Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the victim observed the Defendant photographing the victim's home. The unarmed victim walked to the Defendant's nearby business, during morning business hours, to inquire about the photography. The victim walked about halfway up the driveway to the Defendant's business and motioned toward the victim's house. The victim then turned and walked away from the business. The Defendant rushed forward and began hitting the victim. The victim's actions appear on the surveillance video to be largely defensive. After the brief altercation, the victim was lying on the ground, and the Defendant turned and walked back to his business. He placed his gun on a car and waited for the police to arrive. The Defendant did not call the police or attempt to render any aid to the victim, who had been shot twice. He admitted to the police that he shot the victim and that he did so based upon an ongoing issue between the victim's family and the Defendant. The Defendant showed little remorse after the shooting, telling police officers that he would be "glad" if the victim was dead as a result of the altercation. Based upon this evidence, a jury could reasonably find that the Defendant committed first degree premeditated murder.

As to the Defendant's claim that the State failed to show that the Defendant acted with premeditation, we note that the Defendant, with a gun, walked out of his business to approach the unarmed victim. A jury could reasonably view this conduct as evidence of a

deadly weapon being used against an unarmed victim. Further evidence of premeditation presented at trial was that the Defendant pursued the victim, who was walking away from the Defendant and, after shooting the victim, the Defendant offered no assistance or aid to the victim and walked calmly back toward his business. The prior relationship establishes motive in support of a finding of premeditation in that the Defendant believed that the victim's son had shot him in the foot, five years earlier, and believed the victim deserved this act of retaliation. This is sufficient evidence upon which a rational jury could conclude that the Defendant acted with premeditation. Moreover, the jury heard the Defendant's claims of self-defense. By its verdict, the jury rejected the Defendant's theory of self-defense in favor of the State's evidence that the Defendant acted with premeditation. This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief as to this issue.

## B. Jury Instructions

The Defendant contends that the trial court erred when it denied his request for inclusion in the jury instructions that portion of the self-defense instruction that states that a person using deadly force within his business is presumed to have had a reasonable fear of imminent death or serious bodily injury when the deadly force is used against someone who entered the business unlawfully or forcibly. *See* T.C.A. § 39-11-611(c). The Defendant argues that he was entitled to the instruction because the victim entered his business, posing a threat of imminent death or serious bodily harm to the Defendant. The State responds that the Defendant was not entitled to the instruction because the victim did not unlawfully and forcibly enter the Defendant's business. We agree that the trial court properly declined to include the requested instruction.

Questions involving the propriety of jury instructions are mixed questions of law and fact, therefore, our standard of review is de novo with no presumption of correctness. *See State v. Cole-Pugh*, 588 S.W.3d 254, 259-260 (Tenn. 2019). It is well-settled in Tennessee that a "defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). An instruction on a defense must be given if fairly raised by the proof. *Cole-Pugh*, 588 S.W.3d at 260-264. In determining whether a defense instruction is raised by the evidence, the trial court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense. *See State v. Sims*, 45 S.W.3d 1, 9 (citing *Johnson v. State*, 351 S.W.2d 558, 559 (Tenn. 1975)).

Tennessee Code Annotated § 39-11-611(c) states,
Any person using force intended or likely to cause death or serious bodily injury within a [ ] business . . . is presumed to have held a reasonable belief

of imminent death or serious bodily injury . . . when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the [ ] business . . . and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

The statute defines business as "a commercial enterprise or establishment owned by a person as all or part of the person's livelihood or is under the owner's control or who is an employee or agent of the owner with responsibility for protecting persons and property and shall include the interior and exterior premises of the business." *Id*. § 39-11-611(a)(1).

In the case under submission, the Defendant argues that when the victim walked onto the business driveway and threatened the Defendant, the victim unlawfully and forcibly entered the Defendant's business. The Defendant, therefore, maintains that his use of deadly force was a response to the unlawful entry and that the presumption of reasonableness under Tennessee Code Annotated section 39-11-611(c) should have been included in the jury instructions in this case.

The proof presented at trial, even viewed in the light most favorable to the Defendant, does not present a factual basis for the requested instruction. First, the evidence failed to show that the victim unlawfully and forcibly entered the business. The surveillance footage showed the victim walking halfway up the driveway to the business, gesturing toward his house then walking away. The Defendant contends that due to the posted "No Trespassing" signs, the Defendant was unlawfully on the property. As the State notes, however, the Defendant testified that the signs were posted to prevent customers from entering the shop area where they might be injured. Further law enforcement officers present at the scene did not see any "No Trespassing" signs. The Defendant confirmed to the police that the victim never entered the business but only stood in the driveway, so the victim was not in violation of the "No Trespassing" signs posted for insurance purposes.

Further, the surveillance footage showed that the victim never exercised any physical force against the Defendant at any time. To the contrary, it was the Defendant who chased the unarmed victim after the victim turned and walked away from the Defendant and his business. The Defendant began hitting the victim repeatedly as the victim sank down to the ground. This is further supported by the Defendant's testimony at trial that he walked out to the victim. At no point was any testimony or evidence introduced that showed the victim forcefully entering the business. Instead, the record reflects that the physical altercation, which began after the victim walked away, occurred on the sidewalk by the street. Therefore, there was no factual basis to trigger the use of the requested instruction.

Further, the evidence showed that the victim was walking away from the Defendant and his business when the Defendant attacked the victim from behind and discharged his pistol. Therefore, even if the victim entered onto the Defendant's property unlawfully and presented a threat, when the victim proceeded to leave the property, any threat ended. Accordingly, the trial court did not err in denying the Defendant's requested jury instruction. The Defendant is not entitled to relief.

## III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE